UNITED STATES of America, Plaintiff,

v.

Lawrence S. BULLOCK, Defendant.

No. 86 CR 359.

United States District Court,
N.D. Illinois, E.D.

Aug. 28, 1986.

Joseph J. Duffy, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Sam Adam, Terence Gillespie, Genson & Steinback, Chicago, Ill., for defendant.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Former Illinois State Representative Lawrence Bullock ("Bullock") has been charged in an 18–count indictment, Count Four of which charges him with giving "knowingly and willfully false statements to the government" in violation of 18 U.S.C. § 1001 ("Section 1001"). Among Bullock's pretrial motions was one for severance of Count Four, claiming prosecutori-

al misconduct tainted that count: Assistant United States Attorney Walter Jones ("Jones") had assertedly set up the July 23, 1985 meeting at which the alleged misrepresentations were made "solely as a ruse to remove [Bullock's counsel Edward Genson ("Genson") and Jeffrey Steinback ("Steinback")] from the case" (Motion To Sever 2).[1]

From the briefing on Bullock's motion, it quickly became apparent that:

1. the substantive evidence the government would offer to prove whether Bullock had lied (the gravamen of Count Four) was the identical evidence that would support the indictment's substantive counts, and

2. the conversation during the July 23 meeting—where Bullock denied receiving any cash payments at all—would be offered on the other substantive counts as evidencing Bullock's consciousness of guilt, whether or not Count Four were to be split off.

Whether for those or other reasons, Genson and Steinback announced they would be withdrawing as trial counsel in all events (though they would assist Bullock's trial counsel in preparing for trial), and the motion then shifted to one for dismissal of Count Four or suppression of the July 23 statements or both.

This Court held an evidentiary hearing on the motion, at which Genson, Jones[2] and FBI Agent Scott Hendricks ("Hendricks") testified. Following the hearing the parties have filed cross-briefs and supplemental briefs. This opinion reflects the findings of fact and conclusions of law from that hearing.

## Facts—Both Undisputed and Disputed

Federal investigation of Bullock began in March 1985, with Eugene Blackmon ("Blackmon") acting as a cooperating witness (his cooperation included his consensual recording of conversations with Bullock). At the end of June 1985 the investigation was still under wraps—it had not gone before the grand jury, nor had any grand jury subpoenas issued (Tr. 103, 176–77).[3] At that point, however, the *Chicago Sun-Times* broke a story about Bullock and Blackmon, in part quoting, then questioning, Bullock's denials of the improprieties suggested in the article.

With the matter thus partially out in the open, Hendricks and an FBI colleague went to Springfield July 1 for an interview with Bullock (that decision was made by the FBI agents in conjunction with Jones and his fellow prosecutor, Scott Lassar, in conformity with the FBI's practice of seeking to interview every target of an investigation) (Tr. 178). In Springfield Bullock said to the agents (Tr. 179):

> You guys know better than that; I'd really like to talk to you. I don't have anything to hide; my attorney [who was not then Genson] said that I can talk to the media but not Federal Agents.

Bullock added "that as soon as his attorney said it was okay that he would be glad to talk to us [the agents]" (*id.*).

During the next few weeks after that meeting, Bullock continued to "go public" with his professions of innocence, including a statement on the floor of the General Assembly as well as statements to media representatives and even a television appearance. Eventually, after some conversations between Jones and Genson (who,

---

**1.** Because Genson perceived himself as a likely occurrence witness as to Count Four, he believed ABA Code of Professional Responsibility DR 5–102(A) (of which more later) would require disqualification of both him and members of his firm as Bullock's lawyers. From the beginning Bullock had been represented by Sam Banks ("Banks") as well, but Genson and Steinback had apparently borne the laboring oar for the defense.

**2.** Jones is no longer with the United States Attorney's office and will not, of course, be a prosecutor in the case.

**3.** It was many months later, and over a hundred witnesses had later gone before the grand jury, before this indictment was returned. Those facts are corroborative of Jones' testimony showing that the July 23 meeting was not a prosecutorial ruse undertaken after a decision to indict Bullock had already been made (Tr. 131–32). This Court so finds.

having been retained by Bullock about a week to 10 days after the FBI's visit, promptly initiated a dialogue with Jones), Bullock and his lawyers (Genson and Steinback) ended up in the July 23 on-the-record conference in the United States Attorney's office with Jones, Lassar and the FBI people. Bullock—still unaware the government had the goods on him in the form of recorded conversations between him and Blackmon—repeated the statements he had been making to the world in general. Because his listeners *this* time were governmental investigators and prosecutors, the statements triggered Section 1001.

So much is really uncontroverted. What is in hot dispute is the nature of the discussions between Jones and Genson, and most particularly any representations by Jones, that led to that July 23 meeting. In turn, those questions bear on the usability of Bullock's statements made at the meeting, either as the independent predicate for the Count Four charge or as evidence bearing on other charges. This Court's resolution of the factual disputes (to the extent necessary) will be dealt with in the context of the legal discussion.

### Lawyer Disqualification

■ Initially Bullock's motion urged the government conduct infringed his Sixth Amendment right to counsel: It was allegedly a plot to force Genson's disqualification. Though this Court in no way impugns the bona fides of Genson (and hence of Bullock) in advancing that argument, it is—in all candor—nonsense. Nothing credibly suggests the prosecutors even *considered* the string of hypothetical possibilities that (1) such an on-the-record meeting with Bullock and his lawyers, with (2) its likely prospect of producing a repetition of Bullock's assertedly false statements, and with (3) the further potential prospect that such statements would become the subject of criminal charges, would then (4) have the effect of forcing Genson into the probable witness category—in turn (5) forcing him out as Bullock's lawyer.

Indeed, that attenuated sequence—piling contingency on contingency as it does—not only presumes an astonishing degree of prescience on the part of Jones and Lassar, but it also ignores the thrust of the ethical rule that bears on disqualification.[4] After all, a lawyer is not automatically knocked out of the trial box simply because he or she was present at a substantive meeting. What DR 5–102(A) says (with exceptions not relevant here) is this:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial....

To be sure, it may be assumed that Jones and Lassar expected Bullock, if he came to the July 23 meeting, would make an untruthful statement there. But even on that reasonable premise, it is equally plain that neither the *fact* of Bullock's having made the statement nor its *content* would ordinarily be expected by the prosecutors to be in dispute (that is especially so, given the number of people who would be present at the July 23 meeting). There would thus be no reason for Jones and Lassar to anticipate Genson's likely-witness status—and therefore no reason for them to believe he would be disqualified as trial counsel.[5]

4. It is common lore that the Code, though it literally prescribes only the bases for lawyer discipline, is regularly used by courts in this Circuit to establish the criteria for lawyer disqualification as well. *Original Appalachian Artworks, Inc. v. May Department Stores Co.,* 640 F.Supp. 751, 753–54 (N.D.Ill.1986).

5. What turned out to be true here was that the dispute as to the circumstances that led to the July 23 meeting produced the need for Genson to testify in the bench hearing on Bullock's motion. *That* kind of advance plotting for disqualification would have required a combined Nostradamus and Machiavelli, not just an Assistant United States Attorney (however canny). Indeed, *United States v. Johnston,* 690 F.2d 638, 646 (7th Cir.1982) teaches such pretrial testimony is not at all a per se bar to continuing as trial counsel (and the *Johnston* principle should apply equally to testifying defense attorneys):

To Genson's credit, that original premise of the motion has been pretty much abandoned. Genson and Bullock have decided for themselves that Genson and his partner Steinback would withdraw as trial counsel in any event, and they have in fact done so (though they will continue in the case by assisting the new trial counsel [6]). Whether or not Genson is right in his perception that such withdrawal was called for in ethical terms,[7] that issue is consequently largely moot. Because the question of government purpose remains, however, this Court should make it plain it finds the government was *not* motivated by any purpose of depriving Bullock of his choice of counsel, so as to implicate his Sixth Amendment rights.

### Other Nonissues

■ Another nonissue should be gotten out of the way early. Bullock does not and cannot rely on any notions comparable to entrapment (in the usual sense) to support his current motion. Certainly he had the unprompted predilection to make the challenged statements—he had volunteered the same statements on a number of occasions, and he "welcomed the opportunity to set the record straight" with the prosecutors and FBI as well.[8] Thus the prosecutor's conduct (whether viewed as Genson portrays it or as Jones does) did not "cause" the offense in the entrapment sense. See *United States v. Kaminski*, 703 F.2d 1004,

1009 (7th Cir.1983); *United States v. Manzella*, 791 F.2d 1263, 1269–70 (7th Cir. 1986).[9]

■ Nor was this a "manufactured-jurisdiction" situation akin to that causing the vacation of a conviction in *United States v. Archer*, 486 F.2d 670, 673–74, 681–82 (2d Cir.1973); and see *United States v. Kaye*, 586 F.Supp. 1395, 1401–02 (N.D.Ill.1984). *Archer*'s "manufactured jurisdiction" concept should be distinguished from the idea of an arguably "manufactured offense"— in the sense the alleged crime would not have been committed "but for" the conduct of the governmental actors. To invalidate all crimes of that latter description would paint with far too broad a brush, for it would obliterate the judicial distinctions that divide legal entrapment from its absence (see *Podolsky*, at 180–181) or that mark out "government conduct that passes the line of 'fundamental fairness' and becomes 'outrageous' " so as to implicate due process (*Kaye*, 586 F.Supp. at 1402).

### Real Issues

■ With those preliminaries out of the way, it is time to turn to the main event. On that score there is substantial divergence between the accounts of Genson and Jones as given at the evidentiary hearing this Court conducted. Those factual differences must be addressed first, though (as

As a general rule, the government prosecutor is not to be automatically disqualified as a witness or as trial advocate after testifying at a pretrial suppression hearing, but testifying and continuation as counsel shall be subject to the sound discretion of the trial judge exercised in accordance with the general principles discussed in this opinion.

6. Banks and Bullock have recently reached a parting of the ways, and Banks has been replaced by Sam Adam and Terrence Gillespie.

7. Because that is no longer a live question, this Court of course makes neither any ruling (which would be merely an advisory opinion) nor any comment. As to the effect of lawyer testimony in pretrial aspects of a case on the same lawyer's ability to act as trial counsel, see the extended discussion in *Johnston*, 690 F.2d at 642–45.

8. That was Bullock's statement at the very outset of the July 23 meeting—"the very first words out of his mouth" (Tr. 121).

9. This is of course not the mine-run situation for considering entrapment notions. Where the offense is a substantive one such as arson (as in *Kaminski*), the inquiry is whether defendant "was predisposed to commit the crimes that [the confidential informant or undercover government agent], acting on the government's behalf, hired him to commit" (*United States v. Podolsky*, 798 F.2d 177, 180 (7th Cir.1986)). Where the crime however is making a false statement to government agents, the emphasis in the predisposition inquiry shifts to defendant's inclination to make the *false statements* as such. That predisposition was surely present in Bullock.

will be seen) they do not control the legal outcome.

From both (1) Jones' contemporaneous notes of his July 19 and 22 telephone conversations with Genson and (2) the actual conduct of the July 23 meeting, it appears clear that Genson's recollection of at least some of the discussion that preceded the meeting was faulty. Genson testified there had been an understanding the meeting would deal only with the Bullock-Blackmon relationship regarding the Case International contract on McCormick Place (Tr. 23, 42). Yet Jones' notes of the conversations reflect a substantially broader proposed agenda for the meeting. Indeed, the meeting's discussion actually went into a number of other subjects without complaint from Genson (though he showed no hesitation in directing Bullock not to answer when there were questions about the Bullock-Blackmon dealings on which Genson preferred not to take a position) (see Tr. 63, 90, 182–83; Gov't Ex. 1). If Genson's repeated insistence on that aspect of his prior conversations with Jones (in which he said he recalled Jones' language exactly) is thus rendered dubious, it tends also to cast into doubt his equally precise characterization of what Jones assertedly gave him in the way of a "promise."

On the other side of the coin, though, Jones' version of the facts is not wholly plausible either. Certainly his partial explanation of his reasons for wanting the meeting—to get Bullock pinned down to a story he could not explain away later—is far less than persuasive, in light of Bullock's extensive, public and incontrovertible repetitions of his own version that had preceded the meeting.

It should scarcely be surprising, then, that as to the critical factual issues on the current motion, this Court finds *neither*

Genson nor Jones' version rings entirely true. On the one hand, Genson says Jones affirmatively misled him by saying if Bullock came in and denied Blackmon's charges, and if Jones considered the denial credible, "we can get rid of the case" (Tr. 24; and see Tr. 43, "Let Larry come in and deny it and we may be able to get rid of the case") (that is, no indictment would follow). Of course Jones could have given such an "assurance" with total confidence—the "promise" would have been wholly illusory, because the already-recorded Bullock-Blackmon conversations would necessarily give the lie to any such denial by Bullock.[10]

Jones flatly denied having told Genson "to have Mr. Bullock come in and deny it and we can get rid of this case" (Tr. 119). But he was less positive as to whether he had said anything to that effect (*id.*):

Q. Did you ever say anything that was even similar to that, Mr. Jones?

A. Not that I can recall.

Where recollections differ so sharply, and where lawyers (not only under oath but also burdened with special duties to the court and to the judicial system) are on both sides of that difference, the precise truth is not easy to come by. This Court must necessarily fill in the interstices with the support of such objective facts as there are. It resolves the issues this way:

1. Bullock was indeed eager to come in and "set the record straight" (Tr. 121). Unaware he had been taped, he hoped to give plausible denials and make the issue go away—both saving his political career and avoiding criminal charges.

2. Genson was wholly unaware of the nature of Bullock's involvement with Blackmon. Had he known the situation, of course, he never would have permitted the on-the-record interview.[11] As it was,

---

**10.** Indeed, the alleged promise would have been more truly illusory than the "fantastic hyperbole" coined by Judge Posner in *Podolsky* at 179:

I agree to horsewhip Idi Amin if he ever shows his face on Rush Street.

**11.** Bullock had obviously not leveled with Genson about the Blackmon situation. Jones quotes Genson as having said, when the true

situation was disclosed by the playing of the Blackmon tapes at the August 9 meeting, he had been tricked by his client and that he wouldn't have brought Bullock in "if he had known what a powerful liar he was" (Tr. 127). Genson himself acknowledged he may have used the term "liar" in referring to Bullock (Tr. 45).

he was obviously reluctant to go in with Bullock, but his reluctance was overcome by a combination of (a) Bullock's insistence and (b) Genson's understanding of Jones' willingness to consider ending the matter if Bullock gave a believable denial. And of those two factors, the first—over which Genson had no control—was plainly the dominant one.

3. Jones did not give the outright assurance to which Genson testified, but he had to be aware Genson would draw the inference the meeting could result in extricating his client from any potential indictment. And Jones *knew* that could not happen simply because Bullock uttered a credible denial (a contradiction in terms under the circumstances). Instead Bullock could have avoided criminal charges only if Jones' larger agenda were realized.[12]

In sum, Jones might arguably be said to have provided Genson with an "implied promise." It was not a *false* implied promise, in the sense it would not be kept if Bullock had performed the stated condition. But it would certainly be a *misleading* implied promise, because Jones knew from the beginning it was impossible for Bullock to perform the stated condition: giving a *believable* denial.

"Implied promise" cases classically deal with inculpatory statements, which a defendant seeks to keep out of evidence on the ground they are—in the legal sense—involuntarily obtained confessions. See, e.g., this Court's opinion in *United States v. Goldstein*, 611 F.Supp. 626, 631–32 (N.D. Ill.1985). In constitutional terms, such statements—because self-incriminatory—implicate the Fifth Amendment when they are government-induced.

Bullock's counsel seeks to ring an ingenious change on that doctrine, trying to exclude a false exculpatory statement rather than a true inculpatory statement. Counsel quotes the well-known Supreme Court reference to "any direct or implied promise, however slight" (*Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897)). But counsel meticulously avoids identifying the source on which the claimed right depends—for (as already suggested) *Bram* was of course a Fifth Amendment case, suppressing what was found to be an involuntarily obtained self-incriminating statement.

This Court need not decide whether the Fifth Amendment also protects against the making of a false exculpatory statement, whose "self-incriminating" nature stems not from the content of the statement itself (which, looked at alone, is specifically non-incriminating rather than self-incriminating), but rather from the fact such false statements are rendered criminal acts when made to federal agents. Even prescinding from that intriguing question, the issue is really whether the asserted "implied promise" overbore Bullock's will. Our Court of Appeals, in dealing with the more conventional involuntary confession question, has joined the courts that refuse to apply *Bram* with literal force. See *United States v. Reynolds*, 532 F.2d 1150, 1158–59 (7th Cir.1976) (quoting with approval both the District Court's statement that the *Bram* broad brush "is, however, hardly the rule today" and the statement from *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir.), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967) that the *Bram* "language has never been applied with the wooden literalness urged on us by appellant"); accord, such cases as *Miller v. Fenton*, 741 F.2d 1456, 1467 (3d Cir.1984);

---

**12.** This Court credits Jones' description of his desire "to flip Mr. Bullock to work as a Government witness" (Tr. 125) as having motivated the August 9 playing of the Bullock-Blackmon tapes (*id.*):

Well, certainly one of the key purposes was that we wanted to engage Mr. Bullock as a Government witness. And it was our hope

that by playing the tapes that would encourage him to become a Government witness and testify against other politicians who the investigation had made plain were also party to the extortion.

Indeed this Court has no doubt that was also really the prime reason for Jones' effort to pin down Bullock's story via the July 23 meeting.

*United States v. Robinson,* 698 F.2d 448, 455 (D.C.Cir.1983).[13]

What is at work here is not the "wooden literalness" of *Bram,* but rather the totality-of-circumstances standard described in *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). There the Court, quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961), said the test of voluntariness was whether the statement was "the product of an essentially free and unconstrained choice by its maker" or whether, instead, "his will has been overborne and his capacity for self-determination critically impaired." By that test of the overborne will, Bullock fails. His protestations of innocence—of non-financial-involvement with Blackmon—were made with alacrity and to all hearers. This Court credits Jones' reference to Genson as having characterized himself as "fighting a losing battle ... because Mr. Bullock is insistent upon coming in ... to talk to the United States Attorney's Office" (Tr. 107–08; accord, Tr. 158).

Indeed, this is all of a piece with Genson's own testimony about Bullock. In describing his initial telephone conversation with Jones, Genson referred to Bullock's being "headstrong" (Tr. 16) and said Bullock would have "to make up his own mind" on the decision about going to the prosecutors (Tr. 17). And in recounting his next conversation with Jones, Genson said (Tr. 21):

> He [Jones] said—he commented at that point to the effect that Mr. Bullock had been on television rather recently talking about it again. I said, yes, I learned about him being on television after he went on television and that I was not too pleased in the fact that my client goes on television and talks about the case without me.

Even Genson's portrayal of Bullock's statements at the July 23 meeting confirms

Bullock's independence in deciding what he would and would not talk about (Tr. 58):

> Q. Well, did you allow your client to speak freely to the Government about other things?
>
> A. I lost control, yes.

Accord, Tr. 60.

Finally on the subject of voluntariness, Hendricks' contemporaneous notes of the on-the-record July 23 meeting eliminate any possible residual doubt. As Hendricks testified (Tr. 181):

> Q. Now, did Mr. Bullock say anything at or near the beginning of the meeting about his purpose in being there?
>
> A. Yes, he did.
>
> Q. What, if anything, did he say?
>
> A. He have [sic] indicated that he wanted to come in and make full disclosure because he had an election coming up and he wanted to resolve this matter and get it behind him.

And that is corroborated by Hendricks' description of Genson's statements after the tapes had been played on August 9 and after Bullock and Steinback had left the meeting (Tr. 185, emphasis added):

> Q. Could you describe for the Court Mr. Genson's demeanor at that time?
>
> A. Mr. Genson was angry with Mr. Bullock; furious with Mr. Bullock.
>
> Q. And did Mr. Genson make any statement relative to his bringing Mr. Bullock in for the July 23 meeting?
>
> A. Yes, he did.
>
> Q. What if anything did he say?
>
> A. He said that he was angry because Mr. Bullock had lied to him; but that he believed Mr. Bullock and never would have brought him in if he thought he wasn't being truthful with him. *And, that Bullock was insistent on coming in and making a statement.*

In short, Jones' arguably "implied promise" might perhaps be said (in a rhetorical sense only) to have overborne *Genson's* will [14]—and his intuitive good judgment in

---

**13.** This citation of just a few cases should not be misunderstood as reflecting a split of authority. On the contrary, the *Bram* language is nowhere perceived as an ironclad per se rule.

**14.** That of course is not the sense of the *Schneckloth-Culombe* standard. In like vein, the only arguable "entrapment" evidenced by the testimony was that practiced by Bullock

having resisted Bullock's desire to go into the meeting—but they were certainly not the producer of (or even a causal factor for) any overborne will on *Bullock's* part. Bullock's statements were wholly voluntary in both factual and legal terms.

Accordingly, Bullock's July 23, 1985 statements remain in the case. Count Four is not dismissed, and the related motion to suppress the statements is denied.

himself on his own lawyer, Genson. Jones quoted Genson as having said, after he had later heard the tapes giving the lie to Bullock's July 23 statements (Tr. 165):

A. He got caught with his pants down because this was one of the rare occasions where he had been taken in by a client.