**Rickie COLE, Petitioner-Appellant,**

v.

**Michael LANE, Director, Department of Corrections, State of Illinois, Respondent-Appellee.**

No. 87–1293.

United States Court of Appeals, Seventh Circuit.

Submitted July 30, 1987.

Decided Oct. 2, 1987.

John Lanahan, Cook County Public Defender, Chicago, Ill., for petitioner-appellant.

Kenneth A. Fedinets, Office of Ill., Atty. Gen., Chicago, Ill., for respondent-appellee.

Before WOOD, POSNER and KANNE, Circuit Judges.

PER CURIAM.

Petitioner-appellant, Rickie Cole, appeals the district court's denial, upon remand from this court, of a writ of habeas corpus pursuant to 28 U.S.C. § 2254, 654 F.Supp. 74. Cole argues that his confession was involuntarily obtained and was therefore improperly admitted as evidence at his state trial. Judge Shadur's well-reasoned order resolved the issue of the voluntariness of Cole's confession favorably to the state; we concur in this conclusion and accordingly adopt the order of that court as our own decision. We pause to underscore the fact that Cole's confession in this case is held to have been voluntary notwithstanding a firm promise of leniency made by police while attempting to induce Cole's cooperation.

AFFIRMED.

## APPENDIX 1

## MEMORANDUM OPINION AND ORDER

Rickie Cole ("Cole") has filed a 28 U.S.C. § 2254 ("Section 2254") petition for a writ of habeas corpus against Illinois Department of Corrections Director Michael Lane ("Lane"), based on the admission into evidence at Cole's state court murder trial of his allegedly involuntary confession. This Court initially denied that petition August 20, 1984 (in "Cole I," 589 F.Supp. 848) as the result of finding for Lane and against Cole on cross-motions for summary judgment under Fed.R.Civ.P. ("Rule") 56.

While Cole I was on appeal, Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985) held the ultimate question of a confession's voluntariness is "a legal inquiry requiring plenary federal review." That ruling triggered a June 11, 1986 per curiam opinion by our Court of Appeals ("Cole II," 793 F.2d 155), vacating Cole I and remanding the case to this Court for a determination whether, in light of Miller, Cole's confession was voluntary.[1]

Though each party has made a post-remand submission via legal memorandum, neither has modified his prior summary judgment motion. Accordingly the first order of business is to address those cross-motions in light of Miller and Cole II. By viewing the facts in accordance with any state court findings and, absent such findings, in a light favorable to each nonmovant,[2] a district court can determine whether or not an evidentiary hearing is required (Rule 8 of the Rules Governing Section 2254 Proceedings in the United States District Courts).

*Facts*

On July 30, 1979 Cole, the son of an Elgin Police Department auxiliary police officer (R. 452–53), was 23 or 24 years old

---

1. *Cole II, id.* at 157 instructed:
   Given the holding of *Miller,* it is not permissible to infer from the state court's conclusion that a confession was voluntary that the state courts "must have found" one or another subsidiary fact.

2. *Miller,* 106 S.Ct. at 453 said in part:
   Of course, subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on

the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable.
Cook County Circuit Court Judge Kenneth Cohen really did not make formal fact findings as to such matters during his May 12, 1981 oral bench ruling following a two-day suppression hearing. And because Cole is the nonmoving party on the ultimately successful Rule 56 motion, this Court must draw all reasonable factual inferences in his favor (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)). Hence the text's factual recitation is drawn almost exclusively from Cole's own suppression-hearing testimony.

and had completed two years of college (R. 398, 717). At about 1 p.m. that day Cole was lying in bed in one of the back bedrooms in his apartment when he heard a commotion in the front room (R. 659). Cole entered that room and saw police officers with drawn weapons (*id.*). After the officers' "searching and going through the apartment" (R. 660), Cole says (*id.*):

> They asked me—they would like to take me down to the station and question me about a murder.

Handcuffed, Cole was taken to the Elgin Police Department and placed in an interview room in the basement (R. 661–62). Around 3:15 p.m. Officers Salus, Shaver ("Shaver") and possibly Brictson ("Brictson") took Cole to another basement interview room (R. 663). There Cole was advised of his Miranda rights and then asked whether he was willing to answer questions without a lawyer present (R. 685–89). Cole said he was and signed a waiver of his Miranda rights (R. 688–89).

Shaver and Brictson proceeded to question Cole for about 30 minutes (R. 667, 689).[3] Toward the end of that period they asked Cole whether he had been involved in the Maryann Aikens murder (R. 663). When Cole denied any knowledge of the crime, Shaver allegedly (R. 665–66):

> said something to the effect that it would be better on me to tell the truth, that if I cooperated, that they would get me a manslaughter charge instead of a murder charge. And that if I didn't cooperate, I would get the same thing my brother got for raping a white girl.
>
> \* \* \* \* \* \*
>
> He said it would be better on me if I told the truth and cooperated with them.

Cole says he interpreted that as a "threat" (R. 685)[4] but simply told Shaver he did not want to talk any more (R. 665–

66). Five minutes later Shaver said (R. 667):

> I guess we'll have to fingerprint him and then book him.

At that point Shaver and Brictson led Cole into another room for fingerprinting (R. 667). Shaver began to examine Cole's hand as he fingerprinted Cole (*id.*). Shaver then called some other detectives over and asked them to examine Cole's hands (R. 668). Shaver mentioned "something about there being blood on my cuticles and nails" (*id.*). That statement made Cole "nervous" (R. 679).

Next Cole was taken into another interview room with Shaver and Officer Danielson ("Danielson") (R. 669). Shaver told Cole (R. 670) Brictson was getting some scraping equipment so they could scrape Cole's nails and then run blood tests. Then Cole recalls the following conversation (R. 678):

> Q: Tell his Honor what Detective Shaver said to you as the three of you were in the room?
>
> A: He said something to the effect about, "We have you now, and that is all we need as evidence."
>
> Q: Did they say what "All they need" was?
>
> A: Referring to the blood stain under my cuticles, my fingernails.[5]
>
> Q: Now, after they said that, is that when you gave them your statement?
>
> A: I told Detective Shaver that I had been thinking about what he said about cooperating, and what he said about the manslaughter charge, and I was thinking about telling them what happened.
>
> Q: What did he say when you said that?
>
> A: He asked me, he said, "Do you know you still can have a lawyer if you want to?". And I said, "Yeah." Then

---

**3.** Although Cole had earlier testified (R. 663) the questioning could have lasted an hour or 90 minutes, that is inconsistent with his other time estimates (see n. 10) as well as with Shaver's testimony (R. 407).

**4.** Shaver denied making any threats (R. 406, 461), but as n. 2 indicates this opinion will

credit Cole's statement as to how he viewed the statement.

**5.** As it turned out, there *was* blood on Cole's cuticles, but the sample was not large enough to obtain a blood type or other blood analysis for use in linking Cole to the Aikens murder.

he proceeded on asking me what happened, and I told him.

For about 20 minutes Cole gave an oral statement (R. 672). Shaver then asked Cole if he wanted to give a tape-recorded statement. By then it was about 4 p.m. (R. 675). Cole said "Yes" and gave his statement again for tape-recording (R. 672, 674), finishing a little before 5 p.m. (R. 675–76). After that Cole was placed in the lockup, where he remained until 9:25 p.m., allegedly without access to a phone or lawyer (R. 676).[6]

At 9:25 p.m. Shaver gave Cole a written statement and asked Cole to read and then sign it (R. 677–78). Cole "flipped the pages" without really reading the statement and then signed it (R. 678). Cole says he was "nervous" the entire time he was in the Elgin Police Department basement that day (R. 681–82), though at least outwardly he appeared calm and in control (Judge Cohen expressly so found) (R. 723).

### State Court Rulings

In denying Cole's motion to suppress his confessions, Judge Cohen reasoned in part (in an oral ruling) (R. 725–26) (quoted verbatim):

We have mental—subtle mental threats. He was promised that he would be afforded leniency or considered that.

Now getting first back to the Miranda Rights which I think are raised, The Court feels from all the evidence that the Defendant had been admonished as to his rights, and had not been the subject of any threats, that there was no credible evidence introduced in any way to substantiate any Defendant's claims.

6. Cole concedes he did not request a lawyer during the interrogation (R. 689–90). And although Cole claimed he was not given food or drink (R. 676), he also admitted he had not requested any (R. 690).

7. *Miller*, 106 S.Ct. at 453 (emphasis in original; citations and footnotes omitted) speaks of a "hybrid" voluntariness inquiry:

It is telling that in confession cases coming from the States, this Court has consistently looked to the Due Process Clause of the Fourteenth Amendment to test admissibility.... The locus of the right is significant because it

The Court feels that the words and acts that the police officers as described by the Defendant did not constitute the coercion. That there is nothing here to indicate that any of the acts or the words here were likely to produce any acts or words of the police officers that were likely to produce an untrustworthy confession.

The Court feels that the confession was made freely, voluntarily, knowingly and intelligently, and that the State has met their burden by the preponderance of the evidence.

That voluntariness finding was affirmed by the Appellate Court for the First District in an unpublished June 28, 1983 order (No. 81–1745, slip op. at 6, *mem.* 115 Ill.App.3d 1154, 78 Ill.Dec. 250, 461 N.E.2d 1084).

Although those ultimate state court voluntariness findings are not binding on this Court, *Miller*, 106 S.Ct. at 451 teaches "considered conclusions of a coequal state judiciary" should be given "great weight." With all that in mind, this Court now independently determines whether Cole's confession was voluntary.

### Voluntariness

*Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (citation omitted) defines "the test of voluntariness" this way:

Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.[7]

reflects the Court's consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.... This hybrid quality of the voluntariness inquiry, subsuming, as it does, a "complex of values," ... itself militates against treating the question as one of simple historical fact.

In the *Culombe*-dictated process of "determining whether [Cole's] will was overborne" (*Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed. 2d 854 (1973)) this Court must assess (*id.*, citations omitted):

> the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, . . .; his lack of education, . . .; or his low intelligence, . . .; the lack of any advice to the accused of his constitutional rights, . . .; the length of detention, . . .; the repeated and prolonged nature of the questioning, . . .; and the use of physical punishments such as the deprivation of food and sleep. . . .

By contrast, Cole's current memorandum focuses on two surrounding circumstances to the exclusion of all others in support of the claim his confession was not voluntary. First Cole Mem. 2 points to Shaver's promise of a substantially-reduced sentence in exchange for Cole's cooperation and urges that promise created a "presumption" Cole's confession was involuntary. Cole Mem. 4 then refers to what is characterized as "[t]he only evidence concerning the motivation behind Cole's [confession]": Cole's testimony he "made the statement to the police as a result of thinking about [the leniency promise]."[8] From those two circumstances Cole Mem. 4 reasons "the State" has failed to show Cole's confession was voluntary "by a preponderance of the evidence," so this Court must grant Cole's petition.

That formulation is really a disguised per se rule of involuntariness, which would disqualify *every* post-police-offer confession unless a defendant were so unwise as to "specifically den[y] that the police offer

had any influence . . ." (Cole Mem. 3). After all, the only direct evidence as to a defendant's motivation for confessing—as to intent—must by definition come from the defendant himself,[9] for only he can speak to what went on in his head at the time the confession was given. Thus as Cole would have it, the mere making of any offer of leniency would automatically foreclose matters as to any subsequently-given confession.

Of course that is not the test in habeas proceedings, which seek to determine whether a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States" (Section 2254(a)). Long-established case law (*Culombe* and *Schneckloth* are not the only examples) makes it quite clear the relevant inquiry for that purpose is an objective one: whether, considering the totality of the circumstances, it is found Cole's will was overborne during his interrogation—thus rendering his confession involuntary. Here the circumstances surrounding Cole's confession (those in the *Schneckloth* catalogue and more) lead inescapably to a "no" answer to that question:

1. Cole was an educated adult who appeared both calm and in control when he confessed. Indeed, the level of his education would belie any possible lack-of-intelligence claim (and none was made).

2. Cole was advised of his Miranda rights and was twice told of his right to have an attorney present—the second time immediately before his confession.

3. There was no prolonged or repeated questioning by the police. Indeed Cole confessed after a little over 30 minutes of questioning[10] (his total time in police custody had been about two-and-one-half hours).

---

**8.** As the text has reflected, Cole actually said this (R. 671):

> I told Detective Shaver I had been thinking about what he said about cooperating, and what he said about the manslaughter charge, and I was thinking about telling them what happened.

**9.** This is not a deliberately chauvinistic usage—it simply reflects (1) the fact that *this* defendant

is a male and (2) the awkwardness of repeating the male-female alternatives.

**10.** That estimate is based on Cole's own testimony that (1) his questioning began at 3:15 p.m., (2) he began to give his tape-recorded statement at 4 p.m. and (3) the intervening oral confession had lasted 20 minutes.

4. No "physical punishments such as the deprivation of food and sleep" have been claimed or were testified to.

5. Cole did not confess immediately after the alleged promise of leniency—only after Shaver later noticed blood on Cole's cuticles and told Cole the blood would provide sufficient evidence to link Cole to the murder.

6. Once Cole expressed his desire to confess, Shaver did not proceed (as already indicated) until he had again advised Cole of his right to a lawyer.

Under all those circumstances, it is not enough for a finding of involuntariness simply that Shaver had previously promised Cole leniency (see this Court's opinion in *United States v. Bullock*, 642 F.Supp. 982, 987–88 (N.D.Ill.1986) and cases discussed there).[11] Nor is it enough that Cole considered that promise in deciding whether to confess.[12] To put it differently, although it was at one time suggested that any indication of leniency was both a necessary and a sufficient condition of a finding of involuntariness (*Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897)), the law today is that such an indication is a necessary but not itself a sufficient condition. Or to borrow a familiar concept from another area of the law, it is not enough for the indication of leniency to bear a but-for relationship to the confession in a purely temporal sense (that is, simply to show the defendant would not have considered confessing had the police not raised the subject by speaking of potential benefits). Instead the but-for test is one of proximate cause in the overborne-will sense: whether the police promise caused a deprivation of free will on the part of the then suspect.

Without exception, every element in the *Schneckloth* catalogue points in the opposite direction. Indeed, on Cole's own testimony the subject of leniency was dropped as soon as he said he did not want to talk any more. When he later told Detective Shaver "he had been thinking" about the matter and "about telling them what happened," the whole sequence and Cole's own version of events is a classic example of the free will at work. That the catalyst for Cole's later change of mind was the fear of what his fingernail scrapings would reveal does not somehow operate retroactively to make the leniency offer a will-overbearing promise. And the fact that his fear proved ill-founded does not alter the obvious causal nexus between that fear (and *not* the earlier promise as such) as the triggering event for Cole's confession.

Under the constitutional test reconfirmed in *Miller*, Cole voluntarily chose to confess, and he did so without first exercising his right to consult a lawyer—a right of which Shaver had again reminded him. No doubt Cole—in hindsight, having learned that the results of the blood test were inconclusive and that his confession did not result in a manslaughter conviction—regrets that choice. But such regret is of course irrelevant to the constitutional question.

### Conclusion

There is no need for an evidentiary hearing, nor is there any genuine issue of material fact. Cole is not "in custody in violation of the Constitution." Lane is entitled to a judgment as a matter of law. Cole's Petition is dismissed on the merits.

---

Milton I. Shadur
United States District Judge

Date: January 29, 1987

---

11. As the preceding itemization indicates, the sequence of events itself tends to negate the overborne-will notion—note especially items 5 and 6 and their separation (both in terms of time and events) from the original leniency promise.

12. Because Judge Cohen made no express factual findings in that respect, this Court makes the reasonable inferences favorable to Cole: that a promise of leniency *was* made and that Cole *did* consider that promise in reaching his decision.