**UNITED STATES of America, Plaintiff,**

v.

**Gerald H. SCARPELLI, Defendant.**

**No. 88 CR 623.**

United States District Court,
N.D. Illinois, E.D.

May 2, 1989.

John Burley, Sp. Atty., U.S. Dept. of Justice, Chicago, Ill., for U.S.

Jeffrey B. Steinback, Genson, Steinback & Gillespie, Chicago, Ill., for Gerald Scarpelli.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

On July 16, 1988 FBI Special Agents John O'Rourke ("O'Rourke") and Thomas Noble ("Noble") arrested Gerald Scarpelli ("Scarpelli") for a variety of crimes the agents described in these terms (Tr. 40 [1]):

1. possession of a submachine gun;

2. carrying a weapon during an active crime of violence;

3. interference with commerce by robbery;

4. violation of the Federal Firearms Act; and

5. violation of the Hobbs Act.

During extended custodial interrogation by the agents later that evening and continuing into the early morning hours of July 17, Scarpelli made a substantial number of self-incriminating statements.

■ Scarpelli has moved to suppress those statements under Fed.R.Crim.P. 12(b)(3). Because this Court must independently determine the voluntariness of Scarpelli's confession under 18 U.S.C. § 3501, it held an evidentiary hearing December 21–22, 1988.[2] Both parties have filed post-

---

1. All "Tr." references are to the transcript of the suppression hearing referred to in this opinion.

2. Scarpelli had filed, contemporaneously with his motion to suppress, a motion (1) to have all submissions filed under seal and (2) to close the hearing to the public. Such extraordinary measures were requested because of Scarpelli's stated fears that once the facts of his arrest and statements became publicly known, neither he

nor his family nor his friends would be safe from *Godfather*-style retribution. After balancing Scarpelli's stated interests against the strong public interest in open hearings (see *Press–Enterprise Co. v. Superior Court of California for the County of Riverside,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); *David K. v. Lane,* 839 F.2d 1265, 1276–77 (7th Cir.1988)), this Court granted Scarpelli's requests (see Tr.

hearing memoranda. For the reasons stated in this memorandum opinion and order, Scarpelli's motion is denied.

### FACTS [3]

On March 4, 1988 O'Rourke and Noble stopped Scarpelli as he was driving from his home in Downers Grove, Illinois (Tr. 305). Scarpelli pulled his car into a parking lot on 55th Street and the agents pulled up alongside his car (Tr. 249–51). Noble got out of the passenger side of his car, showed Scarpelli his badge and ordered him to get out of the car and put his hands on the roof. O'Rourke then searched Scarpelli (Tr. 251–53).

Scarpelli was placed in the back seat of the agents' vehicle. Noble sat with Scarpelli in the back seat, while O'Rourke sat in the front. After Scarpelli asked why he was under arrest, Noble replied (Tr. 253):

You're not under arrest. We just want to talk to you.

Scarpelli stayed in the car, and the agents discussed a number of topics with him (Tr. 306–10):

1. They questioned Scarpelli about an ongoing narcotics investigation, but he denied any involvement. He said he didn't participate in that type of activity and "he didn't even use aspirin."

2. They asked Scarpelli about the shooting of Dominick Senese. He claimed an alibi for that crime but said

he would prefer to give that in the presence of counsel.

3. They told Scarpelli the FBI had been investigating him for approximately 18 months and had built a substantial case against him, as a result of which the agents believed he would be indicted. Scarpelli did not respond.

4. They told Scarpelli they were seeking his cooperation with the government and they had surveillances showing him meeting with various members of organized crime in Chicago. Scarpelli denied any involvement with organized crime and said "it would go against his grain" to become an FBI informant.[4]

5. They asked Scarpelli if Edward Genson ("Genson") was his attorney. Scarpelli said "I don't know" and asked whether he needed one.

6. At the end of the conversation, the agents served Scarpelli with a grand jury subpoena. Scarpelli's response was "I'll have to bring an attorney now."

Scarpelli testified the entire meeting lasted 20 to 30 minutes (Tr. 254).

Shortly after the agents' departure Scarpelli phoned his lawyer, Genson's partner Jeffrey Steinback ("Steinback"). Later that afternoon Scarpelli met Steinback in his downtown Chicago office and recounted the just-described encounter. Steinback then phoned Strike Force Attorney John Burley ("Burley"). During that conversation (Hearing Stip. 1):

2–5). Indeed, even absent the special factors impacting on Scarpelli's situation, the balancing process is less heavily weighted toward total public access where pretrial suppression hearings are involved (*Gannett Co. v. DePasquale,* 443 U.S. 368, 378, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979), quoted and discussed in *Press–Enterprise,* 478 U.S. at 14–15, 106 S.Ct. at 2743–44).

3. Scarpelli's account of the events giving rise to his confession conflicts sharply with that of Special Agents Noble and O'Rourke. Although set out in narrative form, this section constitutes this Court's factual findings, including its resolution of all issues of credibility.

4. In fact, the main thrust of the March 4 stop centered on the agents' attempt to solicit Scarpelli's cooperation, an activity for which Noble

testified O'Rourke is "renowned" (Tr. 325). Noble characterized that portion of the meeting as a "long discussion" (Tr. 307). In addition to the matters outlined in the text, Noble also acknowledged telling Scarpelli the agents had information his life could be in danger (Tr. 306). And in discussing Scarpelli's possible role as an informant, the agents pointed out to him (Tr. 308–09):

that he was now 50 years old; he had been arrested before; that usually in organized crime cases the only way it ends—or the way you get out of organized crime is either to go to jail or to be murdered.

Noble then added (Tr. 309):

that his family wouldn't think there was anything wrong with him co-operating with the Government, after turning his life around and coming away from being involved in criminal activity.

1. Steinback asked whether the grand jury subpoena (which called for fingerprints and photographs) required Scarpelli's March 10 appearance or whether other arrangements were possible. Burley agreed to alternative arrangements.

2. Steinback asked whether Scarpelli was presently a target of an investigation. Burley said "no," but "his conduct was being considered in connection with the conduct of others and would consider notifying him if any change occurred in [Scarpelli's] status."

3. Steinback asked Burley to make a note of the fact that Scarpelli's attorneys wished to be present for any future contacts between the government and Scarpelli.

On March 14 Scarpelli, accompanied by Steinback, went to the FBI office to comply with the subpoena. Noble and O'Rourke met Scarpelli there. Steinback told the agents Scarpelli did not wish to speak with them and asked to accompany Scarpelli during the fingerprinting and photographing process. That latter request was denied.

After taking Scarpelli's fingerprints and photographs, the agents again solicited his cooperation. They asked no questions and specifically told him he should answer no questions (Tr. 102–03). But they again told him they had evidence of his criminal involvement and there was "a strong possibility there would be a future case against him" (Tr. 103). They also reminded him "his life was in danger because of a possible syndicate assassination" (id.). Scarpelli still did not agree to cooperate.

On July 16, 1988 a car driven by Scarpelli's girl friend Tricia Radzus ("Radzus"), with Scarpelli as passenger, entered the parking lot of the Sheraton–Homewood Inn Motel, located at 174th Street and Halsted Avenue in Homewood, Illinois (Tr. 37). Radzus drove past the parked car of James Basile ("Basile") to the rear of the motel. Radzus then drove around and stopped under the canopy in the front of the motel. Finally, Radzus drove back around to the rear of the motel and parked next to Basile's car.[5]

Scarpelli then got out of the car, removed a bag from the car and placed it in Basile's trunk. Basile and Scarpelli then got into Basile's car, with Scarpelli on the passenger side. At that point, a number of FBI special agents approached and arrested Scarpelli (Tr. 38).

Scarpelli was searched, handcuffed and placed in an FBI van. Noble occupied the driver's seat and O'Rourke sat in the back seat with Scarpelli. O'Rourke advised Scarpelli of his *Miranda* rights, with Scarpelli confirming that he understood each of them (Tr. 40). As the agents then drove to the federal building in Chicago, O'Rourke told Scarpelli not to ask or answer any questions. Instead the agents just wanted him to listen and "wanted to explain to him what was going on; what was going to happen" (Tr. 40–41).

O'Rourke testified, and this Court finds, the conversation went this way (Tr. 41–44):

A. The conversation consisted of myself and Special Agent Noble informing Scarpelli of basically the—what evidence had been gathered against him. And I told him that James Peter Basile, who he knew as Duke Basile, a close associate of his, and who had been present during the arrest, who he had been meeting with regularly over a period of approximately two years, had been secretly working as a U.S. Government cooperating witness; that Basile had been wearing a concealed body recorder and a transmitter; and that all of the conversations between Basile and Scarpelli had been electronically recorded and listened to by FBI agents; that—that the—that the meetings that he had held with Basile and with other members of the Chicago crime syndicate, such as Salvatore Cautedella and Michael Sarno and various other people, had been surveilled by FBI agents, and that surveillance photographs had been taken. He was shown samples of surveillance photographs showing him meeting with Basile at various locations. He was informed that his involvement in a resi-

---

**5.** Govt. Ex. 88 is a sketched diagram of the motel and Scarpelli's path around the motel.

dential burglary which occurred in Michigan in August of 1987, where they left from the Sheraton–Homewood Inn, and he and Basile and James Mundo drove to Michigan City, Indiana to conduct a residential burglary during the course of which a safe was opened and approximately $30,000 in cash was taken and in which Scarpelli had carried a Mac 10 submachine gun had all been under FBI surveillance and that it had been videotaped; that the conversations had been electronically recorded; and that upon the return of—from Michigan City, Indiana, back to the Chicago area they had been under close FBI surveillance; that their conversations had been recorded as they split up the money; and that another incident in which there was a stolen Chevrolet and a stolen Ford van secreted in a garage called The Champion Liquidators Garage, at 3712 West LeMoyne Avenue on the North Side of Chicago, in which there had been a duffel bag containing a Mac 10 submachine gun, pistols, revolvers, Halloween-type false face masks, walkie-talkies, handcuffs, gloves, books containing the crystal numbers and frequencies of various law enforcement agencies and various other materials, had—had been under close FBI surveillance; that the vehicles had been affixed with electronic listening devices; that surreptitious entry had been made by Court order by FBI agents, and that the weapons had been photographed and that they had been made inoperable so they could—they couldn't fire.

And we showed Scarpelli photographs of the submachine gun and other weapons and materials. I showed him photographs of the garage. I informed him that he had been observed along with a criminal associate of his named Robert Bellavia physically removing the two vehicles, which were stolen vehicles, from the garage and driving them to another location a few blocks away during August of 1987.

Q. Did you speak of a date?

A. August—excuse me. During—I did. I'm sorry. Yes. During, I believe it was April of 1987. Excuse me. I'm thinking of Michigan City.

We informed him that we had had him under close surveillance during a period when he and Basile had planned to conduct a burglary of a jewelry store in Berwyn, Illinois.

We showed him surveillance photographs of them actually looking in the jewelry store window, examining the front lock of the jewelry store; advised him he had been observed looking at the burglar alarm box at the back of the jewelry store on numerous occasions. Showed him some surveillance photographs taken during this period, and various other developments that had occurred during the case to show him that we had, in fact, developed a sufficient amount of evidence against him; and reminded him, of course, that he was on federal parole at that time and had been just arrested in possession of a submachine gun and a pistol, and we knew that he had been en route to participate in an armed robbery to occur in Bradley, Illinois.

After examining some of the photographs, Scarpelli said (Tr. 44):

Boy, you guys are pretty slick, You got me real good.

Just before 9 p.m. the agents arrived at the federal building with Scarpelli. They moved him to an interview room on the ninth floor (Tr. 46), seated him in a chair and handcuffed him to the chair.[6] Once again the agents advised Scarpelli of his rights by reading him FBI Form FD–395 ("Advice of Rights") (Govt.Ex. 89). Scarpelli was asked to read the form and, when asked if he understood his rights, replied (Tr. 47):

Yeah, I know. I've been through it before.

Scarpelli was also asked to sign the waiver portion of the form. He responded in ef-

---

**6.** It is unclear how long Scarpelli remained handcuffed in that manner. Scarpelli Mem. 4 implies he was handcuffed during the entire interrogation, while O'Rourke testified Scarpelli was handcuffed "for a period of time" (Tr. 46).

fect (*id.*):[7]

> No, Jack, I don't want to sign it right now. Let's talk for a while first. I'll sign it later.

Scarpelli then pushed the form back on the desk, where it remained until he signed it later in the evening (*id.*)

Scarpelli was specifically offered the opportunity to call his attorney. Indeed, the phone was pushed toward him and he was told he could call anyone he wanted (Tr. 59). Scarpelli declined the offer. He expressed concern that word of his arrest would leak out. O'Rourke testified that Scarpelli (*id.*):

> asked, for instance, who else knew that he had been arrested, and generally expressed concerns that no one be informed and that he did not want his attorney notified or anyone else.[8]

During the interrogation Scarpelli was repeatedly offered coffee, soft drinks and food. He declined those offers. Scarpelli did ask and was permitted to use the bathroom on several occasions (Tr. 60).

At the beginning of the interrogation the agents laid out the evidence against Scarpelli and discussed the various crimes he was suspected of committing. According to O'Rourke (Tr. 62–63):

> He was informed that in view of the evidence against him that the best policy would be for him to tell the truth, to co-operate fully, to consider becoming a U.S. Government witness, and co-operating completely in providing information, historical and current, concerning his membership and activities in the organized crime syndicate in Chicago.
>
> And an appeal was made to him to become a U.S. Government witness, to tell the truth. And he was advised any co-operation, any such information provided to [sic] him would be made known

to federal prosecutors and that was his best policy.

\* \* \* \* \* \*

He was advised that we wanted his total cooperation. We wanted to be able to debrief him in detail. That he—all of the information provided by him, if he decided to co-operate would be carefully checked out; that he would be expected to testify in federal court, and actively participate in investigations by the FBI that were ongoing. We wanted him to co-operate completely and totally.

To that point the conversation had lasted 30 to 40 minutes (Tr. 61). At about 10 p.m. Scarpelli inquired about Radzus, asking whether she was in the FBI office and whether she had been arrested. He also expressed concern that Radzus might call someone, thereby revealing his arrest (Tr. 54–55). Shortly thereafter the agents had Radzus brought to Scarpelli's interview room. They were allowed to talk alone for 5 to 10 minutes (Tr. 55–6; 120–21; 315). After talking to Radzus, Scarpelli told the agents (Tr. 57):

> that he had advised her that he wanted to continue to speak with the agents, and that he did not want her to make any telephone calls and to call an attorney or to call anybody at all. He wanted to—he wanted it kept secret that he had been arrested.

At about 11 p.m. Scarpelli decided to cooperate (Tr. 121) and started to answer the agents' questions (Tr. 62). After about 45 minutes they all took a break (Tr. 121). At midnight the agents renewed their request that Scarpelli sign the waiver of rights form (as Scarpelli had earlier said he would do): They once again read Form FD–395 to Scarpelli, and he then read over the form and signed the waiver portion at the bottom. Noble and O'Rourke filled in the time and date and both signed the form as witnesses (Tr. 47–48, 319; Govt.Ex. 89).

---

7. O'Rourke said he could not remember Scarpelli's exact words, but he recounted the same version later in his testimony (Tr. 131–32).

8. [Footnote by this Court] Noble's testimony was also consistent on this point. He later testified Scarpelli said (Tr. 318):

I don't want anybody to be called.
Indeed, Radzus testified Scarpelli instructed her to the same effect when the two of them were given the opportunity to talk privately about 10 p.m.

After Scarpelli signed the form, he and the agents discussed the form his cooperation might take. Essentially the agents proposed that Scarpelli would meet with other members of the Chicago organized crime syndicate while wearing a body recorder. Scarpelli agreed to that arrangement (Tr. 63–64).

After providing information for a period of time,[9] Scarpelli said he would be willing to meet with other members of the syndicate but could not change his normal method of living (Tr. 66). Scarpelli said to avoid suspicion "he would have to be free and not be under close FBI surveillance or supervision" (*id.*). But O'Rourke told Scarpelli (Tr. 67):

> that he was under arrest and that before he could wear a body—concealed body recorder and transmitter that Department of Justice authority would have to be required, and that for him to operate on the street he would have to—that decision would have to be made by FBI supervisory personnel and the Strike Force attorneys involved in the case. It would not—this decision would not be made by Agent Noble or myself and that would have to be worked out, and it was not known if that would be possible or not.

Neither at that point nor at any other during the protracted session did the agents make any promises or threats of any kind or exert any type of force (Tr. 54, 317–18).

Scarpelli continued to provide information and answer questions until about 2 a.m. Sunday, July 17. At that time the agents asked Scarpelli if he had a passport and whether or not he had additional weapons hidden at this home in Hillside, Illinois.[10] Scarpelli said he did have a passport but had no additional weapons (Tr. 81). Scarpelli then signed a consent form autho-

rizing O'Rourke and Noble to search his residence for weapons and a passport (Tr. 82; Govt.Ex. 98).[11] O'Rourke and Noble signed the form as witnesses.

At about 2:10 a.m. Radzus was brought back to the interview room, where she conferred alone with Scarpelli for 5 to 10 minutes (Tr. 82–83, 122). Radzus then also signed a consent form (similarly limited to weapons and a passport) authorizing a search of her residence. O'Rourke and Noble witnessed that signature (Tr. 82–84; Govt.Ex. 99).

At about 3 a.m. Scarpelli again started to provide information. That portion of the interrogation lasted about 90 minutes until 4:30 a.m., when Scarpelli took a break to use the bathroom (Tr. 123–24). At 4:32 a.m. O'Rourke consulted with a Strike Force attorney (*id.*).[12] At 4:45 a.m. the interrogation ended (Tr. 125).

When all was said and done, Scarpelli had confessed to a variety of gruesome crimes, including armed robberies and murders. He admitted to possessing a "Mac 10 submachine gun" and to having planned and participated in several robberies (Tr. 77–80).

He admitted that when he was arrested at the Sheraton–Homewood Inn on July 16, he and Basile were en route to a planned armed robbery of a merchandise store in Bradley, Illinois (Tr. 80–81). In that connection he acknowledged having removed a Sten submachine gun and .22 caliber revolver from his car and putting them into Basile's car (Tr. 81).

Finally Scarpelli also admitted to participating in the murders of George Christofalos (Govt.Ex. 92), William and Charlotte Dauber (Govt.Ex. 93) and Michael Oliver (Govt.Ex. 94).[13] Scarpelli signed state-

---

**9.** Again it is unclear exactly how long Scarpelli had been cooperating. O'Rourke testified only that Scarpelli had been cooperating "for some time" (Tr. 65).

**10.** Scarpelli shared the residence with Radzus.

**11.** Because the consent form was a standard document with all-inclusive language, Scarpelli indicated his limited consent by scratching out the words "letters, papers, materials" and insert-

ing the words "weapons, passport" (Govt.Ex. 98).

**12.** O'Rourke did not identify the attorney by name.

**13.** Govt.Exs. 92–94 are signed, typed versions of Scarpelli's earlier handwritten confessions. Those original handwritten statements are Govt. Exs. 95–97.

ments in which he confessed to participating in all four murders. O'Rourke and Noble witnessed each of those statements.

### Positions of the Parties

Scarpelli has launched a multi-pronged offensive in support of his motion to suppress:

1. His statements were involuntary and therefore inadmissible.

2. He invoked his right to counsel before the July 16–17 interrogation, so the government is precluded from establishing a waiver of that right.

3. He also invoked his right to counsel during the July 16–17 interrogation, but the agents ignored his request.

4. This Court should exercise its supervisory power because the government violated ABA Code of Professional Responsibility DR 7–104(A)(1).

5. He was not given timely *Miranda* warnings or, in the alternative, the warnings given were inadequate.

Unsurprisingly, the government disputes each of those arguments. The opinion will deal with each, though in a different sequence.

### Miranda Warnings

■ One of the few sets of legal principles that have gained widespread recognition by the general public is that announced in *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966): Every person in custody subjected to interrogation must be clearly informed that he or she has the right to remain silent; that anything he or she says can be used against him or her in court; that he or she has the right to consult an attorney and to have an attorney present during questioning; and that if he or she cannot afford an attorney one will be appointed to represent him or her. Scarpelli

says he did not receive those warnings. That argument deserves short shrift.

As a factual matter this Court finds Scarpelli was given his *Miranda* warnings not once but three times:

1. First the warnings were given orally in the van, immediately after Scarpelli's July 16 arrest at the Sheraton–Homewood Inn.

2. Then Scarpelli was again given the warnings when he arrived at the FBI offices at 9 p.m. July 16. There Scarpelli read Form FD–395 and orally acknowledged he understood his rights.

3. Finally, Scarpelli was again read the warnings at midnight in the course of the renewed request that he sign Form FD–395. Scarpelli reread the form and then signed the waiver.

To be sure, Scarpelli testified he received no warnings in the van (Tr. 270) and he was not presented with the waiver form until after his confession (Tr. 302–03). But that testimony was simply not credible, and it is rejected.[14]

In the alternative, Scarpelli Mem. 22 argues that O'Rourke's warnings given in the van were flawed. O'Rourke testified (Tr. 40, emphasis added):

I advised Scarpelli that he had been placed under arrest by Special Agents of the FBI; that he was arrested on charges of being in the possession of a submachine gun; carrying a weapon during an active crime of violence, and interference with commerce by robbery; violation of the Federal Firearms Act and the Hobbs Act, and that he was going to be questioned; that he had a right to remain silent and not to answer any questions; that he had a right to ask— anything that he did say would be utilized against him in court; that he had the right to ask an attorney or contact an

14. *Miranda* is the classic example of a revolution in law enforcement practices wrought by judicial decision—so much so that the name of an obscure criminal defendant has entered the everyday vocabulary of nonlawyers as well as lawyers. Most important, it defies credulity to consider that experienced FBI agents, on the brink of what they hope will prove a major

investigative breakthrough, would omit a step they know is so critical to the use of any information they elicit. To the law enforcement officer the *Miranda* warnings are given catechism status—much like the automatic recital of name, rank and serial number by the member of the armed forces.

attorney for advice before answering any questions, and to have an attorney with him during any questions. *And that if he could not afford an attorney that one would be appointed for him by the Court,* and that he could stop answering questions at any time and consult with an attorney during the course of the questioning.

Scarpelli points to the underlined language, labeling it as a "conditional warning—linking the appointment of counsel to a future event" (Mem. 22). As such, Scarpelli urges it is prohibited by the decision in *Eagan v. Duckworth,* 843 F.2d 1554 (7th Cir.1988), *cert. granted,* — U.S. —, 109 S.Ct. 218, 102 L.Ed.2d 209 (1988) and oral argument heard March 29, 1989.

*Eagan, id.* at 1555–56 (emphasis in original) held the following warning violated *Miranda* because it was misleading:

> You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer but one will be appointed for you, if you wish if and when you go to court.*

That underlined language was found flawed because it "limits and conditions an indigent's right to counsel on a future event" (*id.* at 1557).

■ But *Eagan* (even if upheld by the Supreme Court) is clearly inapplicable here. O'Rourke's warnings contained no limited or conditional offer. Instead O'Rourke told Scarpelli—with total accuracy—that if he could not afford an attorney, one would be appointed for him by the court. Indeed, what other meaning can the assurance of "appointed" counsel have?[15] It must be concluded that O'Rourke's warnings to Scarpelli pass constitutional muster (see

*United States v. Sanchez,* 859 F.2d 483, 484–86 (7th Cir.1988)).

Moreover, Form FD–395—tendered to Scarpelli at the same time as O'Rourke's oral warnings—clearly informed Scarpelli of his right to an attorney. That form was simple, concise and contained no arguably conditional warnings. Thus, each of Scarpelli's three warnings (the last two flowing from Form FD–395) complied with *Miranda*'s dictates. Scarpelli's *Miranda* arguments are rejected.

### Voluntariness of Scarpelli's Statements

Scarpelli's principal contention is that his statements were not the product of free will (Mem. 1). Of course a confession coerced by federal agents violates the Due Process Clause. Our Court of Appeals has confirmed the standards for district courts asked to assess the voluntariness of a confession (*Cole v. Lane,* 830 F.2d 104, 107–08 (7th Cir.1987) (per curiam), adopting this Court's opinion at 654 F.Supp. 74, 77 (N.D. Ill.1987) (footnote omitted)):

> *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (citation omitted) defines "the test of voluntariness" this way:
>
>> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

In the *Culombe*-dictated process of "determining whether [Cole's] will was overborne" (*Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)) this Court must assess (*id.,* citations omitted):

> the totality of all the surrounding circumstances—both the characteristics

---

15. Even were the FBI—or the United States Attorney—in a position to provide counsel to a person in custody who requests a lawyer, the almost inevitable result would be a challenge to the independence of the counsel provided in that fashion. It is again worth recalling that *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628 reject- ed the notion "that each police station must have a 'station house lawyer' present at all times to advise prisoners" and spoke instead of the right "that if he cannot afford an attorney one will be *appointed* for him prior to any questioning if he so desires." (*id.* at 479, 86 S.Ct. at 1630, emphasis added).

of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, ...; his lack of education, ...; or his low intelligence, ...; the lack of any advice to the accused of his constitutional rights, ...; the length of detention, ...; the repeated and prolonged nature of the questioning, ...; and the use of physical punishments such as the deprivation of food and sleep....

One brief detour is necessary before applying that test to the facts of this case. Scarpelli Mem. 8 urges that his statements were involuntary because they were the product of government inducements. To that end Scarpelli invokes *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897) (quoting 3 Russell on Crimes 478 (6th ed.)):

> [A] confession in order to be admissible must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.

Scarpelli identifies two alleged promises by the agents—one to release Radzus and another to put him back on the street as an informant.

But a legal structure constructed on *Bram*'s foundation of prohibiting "any promises, however slight" rests on quicksand. Nearly three years ago this Court looked at the same issue and said in *United States v. Bullock,* 642 F.Supp. 982, 987 (N.D.Ill.1986):

> Our Court of Appeals ... has joined the courts that refuse to apply *Bram* with literal force.

Then last year *United States v. Long,* 852 F.2d 975, 977 (7th Cir.1988) (citations omitted) again rejected an invitation to expand *Bram*'s application:

> *Bram* has not been liberally applied. It does not establish a per se rule; a review of the totality of the circumstances is still required and any inducement offered to the defendant is but one fact, albeit an important one, in that analysis.

Concurring in *Long,* Judge Easterbrook first observed that *Bram* "is inconsistent with the totality-of-the-circumstances inquiry of *Schneckloth* ..." (*id.* at 980) and then added (*id.*):

> *Bram* has not excluded a confession in decades; it is a derelict, offering false hope to suspects and vexing judges who must distinguish it on the way to decisions reached on other grounds. It is a source of pointless litigation, an irritant only a higher court may remove.

This opinion returns then to the *Culombe–Schneckloth* analysis, mindful of the facts that any government promises are an important factor in the equation and that *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618 (1972) teaches "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." For purposes of that analysis Scarpelli urges:

1. His past spurning of attempts by FBI agents to solicit his cooperation shows he "was not at all inclined to make incriminating statements to the agents" (*United States v. Goldstein,* 611 F.Supp. 626, 630 (N.D.Ill.1985)).

2. He was handcuffed to a chair during the interrogation and deprived of normal sleeping conditions.

3. His interrogation was prolonged and intense, lasting approximately nine hours (measured from the initial arrest in Homewood to the end of the interrogation).

4. He confessed without counsel and in contradiction of his history of dealing with the government through counsel.

5. Both agents employed psychological pressure "by warning him that he and his loved ones were possible assassination targets, confronting him with what they contended was overwhelming evidence and repeatedly telling him he would be incarcerated for the rest of his life" (Mem. 4–5).

6. In addition, the agents conditioned Radzus' release on his cooperation.

7. Finally, the agents promised to put him "back on the street as a government informant" (Mem. 10).

■ Based on its review of the evidence, this Court rejects Scarpelli's contentions in factual terms. In their totality, the circumstances surrounding Scarpelli's confession (those in the *Schneckloth* catalogue and more) compel the conclusion that his confession was voluntary:

1. He had taken no drugs or alcohol and was not otherwise impaired on July 16 (Tr. 280–81).

2. He was neither physically hurt nor physically threatened during the extended interrogation.

3. He was repeatedly offered coffee, soft drinks and food. On several occasions he asked for and was given permission to use the bathroom.

4. His argument that he was deprived of normal sleeping conditions will not bear scrutiny. It will be remembered that when he was arrested at 8 p.m. he and Basile were contemplating a driving trip to Bradley, Illinois (some 35 miles away), where they would pull off an armed robbery, followed of course by the necessary getaway. Instead he spent something less than nine hours with Noble and O'Rourke. During that time the agents allowed Scarpelli to take numerous breaks and twice allowed him to talk with Radzus. Nothing in that substituted (though unanticipated) activity justifies Scarpelli's characterization. Although his own "work" planned for that night was criminal in nature, he has made no showing that would distinguish his situation from that of (say) a night watchman apprehended at the beginning of his shift and required to spend a comparable period in interrogation under like conditions.

5. This opinion has already dealt at length with the facts and circumstances of his three *Miranda* warnings.

6. He was explicitly provided the opportunity to use the phone to call anyone he wished.

7. He was and is intimately familiar with the criminal justice system. He has been convicted of four different crimes (Tr. 296, 301–02) and is well aware of his constitutional rights. When the agents asked him if he understood his *Miranda* rights, he replied (Tr. 47):

> Yeah, I know. I've been through it before.

8. He is neither young (he is 51 years old) nor uneducated (he is a high school graduate) (Tr. 247, 296). Based on its observation of Scarpelli and its consideration of his testimony, the Court finds him to be of at least average intelligence and experience.[16]

Over and above that brief catalogue of *Schneckloth*-type considerations, several points merit more extended discussion. This opinion turns to those matters.

■ First, Scarpelli asserts he was deprived of counsel. This Court rejects that

---

16. Govt.Mem. 3 notes that on a prior occasion Scarpelli made an incriminating statement, then afterward sought to disavow his confession by asserting duress (see *Gagnon v. Scarpelli,* 411 U.S. 778, 780, 93 S.Ct. 1756, 1758, 36 L.Ed.2d 656 (1973)). Without saying so, the government apparently views this evidence as admissible under Fed.R.Evid. 404(b). Scarpelli Mem. 7 n. 5 retorts the evidence fails to meet "the requisites for 404(b) consideration." Such recent cases as *United States v. Harrod,* 856 F.2d 996, 999 (7th Cir.1988) have continued to reconfirm the viability of the test stated in *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984) for determining the admissibility of other acts evidence:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue ...,

> (3) the evidence is clear and convincing, and
> (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

During the hearing this Court indicated concern over the long time span between the two incidents, noting that "404B calls for a lot more proximity in time, ordinarily, than what we're talking about here" (Tr. 298). What the government's discussion has not focused on, but would appear to bear directly on admissibility, is that "the matter in issue" that "the evidence is directed toward establishing" is Scarpelli's credibility. That might create a better prospect for admissibility under Fed.R.Evid. 608(b) than the other-acts predicate the government seems to assert under Fed.R.Evid. 404(b). However, this Court is disinclined to do the government's lawyering for it. In any case, this opinion has treated the evidence as inadmissible and it was not considered on the voluntariness issue.

claim as a factual matter. It finds he was offered the opportunity to call counsel (or anyone else) but declined to do so. That is readily understandable, given Scarpelli's insistence that his arrest be kept secret (it will be recalled he also asked to see Radzus so he could tell her to keep quiet). Because Scarpelli realized the agents had him dead to rights (as the result of Basile's activities as a mole) and therefore decided he would be better off to cooperate, it was only natural that he would not want word of his cooperation spread on the street. And of course his arrest would have to remain secret if he were to act as a government informant.

Nor is that view altered by Scarpelli's asserted past history of dealing with the government only through counsel. Again the situation was changed dramatically by the government's detailed evidence of his criminal activity with Basile. This Court finds he then evaluated the situation and decided to engage in what he perceived to be in his own best interest: He would provide information in order to have a better chance of government leniency.

▇ It is also inaccurate to say, as Scarpelli urges, that the agents applied undue psychological pressure when they confronted Scarpelli with their evidence and warned him of a possible assassination attempt. That cannot fairly be characterized as a threat. Scarpelli's testimony to the contrary is not credible.

▇ Similarly, this Court does not credit Scarpelli's testimony that the agents promised to put him "back on the street as a government informant." They clearly had no authority to make such a promise. Instead, O'Rourke told Scarpelli that FBI supervisory personnel and Strike Force attorneys would have to make that decision (Tr. 67). In sum, this Court finds the agents made no promises to Scarpelli and offered him no deals.

▇ That leaves only Scarpelli's claim that the agents conditioned Radzus' release on his cooperation. O'Rourke confirms Scarpelli's concern about Radzus: He asked if she had been arrested, wanted to know if she was going to be charged and asserted she had no knowledge of any crimes (Tr. 58). But both agents deny they ever conditioned Radzus' release on Scarpelli's cooperation (Tr. 59, 317).

Radzus' version of events is that shortly after her arrest (around 8:15 p.m.) she asked what would happen to her car. Agent Jerry Mann (whom she described as 5'10", 175 pounds) then said (Tr. 215–16):

It all depends on what Jerry tells us tonight.

Radzus was then taken to the FBI offices. She says that shortly before her 10 p.m. meeting with Scarpelli she asked a second man (whom she described as "somewhat shorter than Jerry Mann and had gray hair ... [m]ore of a stockier build" (Tr. 217)) why she was being arrested. He replied (Tr. 218):

How about aiding and abetting an armed robbery for starters?

When she then later asked if she still had to be fingerprinted, he said (Tr. 219):

Well, it all depends on what Jerry says.

Radzus says she then met with Scarpelli and told him what the agents had told her (Tr. 220). She was upset and told Scarpelli about being arrested and handcuffed (*id.*).

Even if Radzus' testimony in those areas were fully credited, that would not support the result Scarpelli seeks to draw from the narrative. For agents to say that Radzus' possible involvement in the planned criminal activity of that evening "all depends on what Jerry tells us tonight" or "all depends on what Jerry says" is wholly unexceptionable if it is taken as a reference to whether or not Scarpelli implicated her.[17] That reading is at least as plausible as the more strained version that Radzus was being

---

17. As Govt.Ex. 88 and the text accompanying n. 5 reflect, the circuitous path Radzus followed before she and Scarpelli ultimately joined Basile in the motel parking lot that night is certainly indicative of a desire to avoid detection—at least being on the lookout to see whether someone was following them. It would be a reasonable inference for the agents to draw that Radzus might be more than an innocent chauffeur for Scarpelli, so that Scarpelli's explanation would bear importantly on whether they would consider charging her.

held hostage to pressure Scarpelli into cooperation. What controls here is how *Scarpelli* perceived the situation, and this Court rejects his testimony that he viewed matters in that light and succumbed out of a desire to extricate Radzus.

Over and above that, this Court has some difficulty in fully crediting *Radzus'* version of the facts. This is not to say that she was wholly lacking in credibility in the critical areas, as was true of Scarpelli—the impression she gave was of a far less worldly and experienced person than Scarpelli (she is 28 years old to his 51, and there was no indication that she has a prior criminal record—a permissible basis for impeachment if the government had such information). At the same time, she has a keen interest in the outcome, and it may fairly be inferred that her testimony was colored in Scarpelli's favor.

This Court does so conclude. Accordingly it credits the portion of Radzus' testimony as to the agents' statements only to the extent that the agents indicated to her that the possibility of her arrest would depend on whether Scarpelli did or did not implicate her with knowledge of the Scarpelli–Basile activity (which would indeed support a potential aiding-and-abetting charge against her). Once more, however the dispositive fact is *Scarpelli's* lack of any belief that Radzus' non-arrest and release hinged on his agreement to cooperate and to provide information, and this Court so finds.[18]

Thus a review of all the circumstances surrounding Scarpelli's arrest and interrogation reveals that the agents employed no coercion. Scarpelli was cognizant of his situation and freely decided to cooperate. His statements were voluntary. No due process violation occurred.

**18.** Had Scarpelli possessed and acted on such a belief, the outcome would have been different. While some circuits hold "a confession is not *per se* invalid merely because the confessor implicates himself in an effort to secure the best possible disposition of a charge pending against a relative or friend" (see, e.g., *Ferguson v. Boyd,* 566 F.2d 873, 878 n. 7 (4th Cir.1977) (per cu-

### Right to Counsel

Scarpelli asserts his right to counsel was violated because he invoked that right both before July 16 and during the July 16 interrogation. At the outset it is uncertain just what right Scarpelli is advancing—his Sixth Amendment right or the derivative right to counsel flowing from *Miranda* (a Fifth Amendment case). This opinion therefore addresses both issues.

*Moran v. Burbine,* 475 U.S. 412, 428, 106 S.Ct. 1135, 1145, 89 L.Ed.2d 410 (1986) has again emphasized the Sixth Amendment right to counsel does not attach until the initiation of adversary judicial proceedings. There the defendant urged expansion of that right (*id.* at 429, 106 S.Ct. at 1145):

> The right to non-interference with an attorney's dealings with a criminal suspect, he asserts, arises the moment that the relationship is formed, or, at the very least, once the defendant is placed in custodial interrogation.

*Moran* declined the defendant's offer in no uncertain terms (*id.* at 430, 106 S.Ct. at 1146 (citations omitted)):

> Questions of precedent to one side, we find respondent's understanding of the Sixth Amendment both practically and theoretically unsound. As a practical matter, it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation.... More importantly, the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a

riam) and cases cited there), our Court of Appeals has announced a different rule. *United States v. Bolin,* 514 F.2d 554, 560–61 (7th Cir. 1975) held a defendant's consent, given "while undergoing custodial interrogation and after he had been impliedly threatened that his girl friend would be arrested if he did not sign, ... was involuntary and therefore invalid."

suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecutio[n]," U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the " 'prosecutorial forces of organized society.' " ... By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies ... of law," ... is needed to assure that the prosecution's case encounters "the crucible of meaningful adversarial testing."

Consequently the Court went on to express its rejection of the notion that custodial interrogation alone triggers the Sixth Amendment right (*id.* at 431–32, 106 S.Ct. at 1146–47).

▪ It remains settled, then, that the right attaches *only* with the initiation of adversary judicial proceedings.[19] *United States v. Gouveia,* 467 U.S. 180, 187–88, 104 S.Ct. 2292, 2296–97, 81 L.Ed.2d 146 (1984), quoting *Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411 (1972), fleshed out that concept as comprising formal charge, preliminary hearing, indictment, information or arraignment.

None of those situations (or anything even remotely approaching them) existed in Scarpelli's case. He can find no solace in the Sixth Amendment.

That leaves only the Fifth Amendment, as to which *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628 teaches:

> If an individual states that he wants an attorney, the interrogation must cease until an attorney is present.

*Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) reconfirmed that principle, emphasizing "that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards, id.* at 484–85, 101 S.Ct. at 1885 therefore held:

that an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police.

Such a bright line rule "serves the purpose of providing 'clear and unequivocal' guidelines to the law enforcement profession" (*Arizona v. Roberson,* —— U.S. ——, 108 S.Ct. 2093, 2098, 100 L.Ed.2d 704 (1988)). By invoking his right to counsel, the accused signals his belief that he is not competent to deal with the government without legal advice. Thus "a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism" (*Roberson, id.,* quoting Justice White's concurrence in *Michigan v. Mosley,* 423 U.S. 96, 110 n. 2, 96 S.Ct. 321, 324 n. 2, 46 L.Ed.2d 313 (1975)).

*Moran,* 475 U.S. at 421, 106 S.Ct. at 1141 (citations omitted) has reconfirmed a two-factor test for any claimed *Miranda* waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

Similarly *North Carolina v. Butler,* 441 U.S. 369, 372–73, 99 S.Ct. 1755, 1756–57, 60 L.Ed.2d 286 (1979), quoting *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628, reconfirmed the placement of a "heavy burden" on the government to demonstrate waiver. *Butler,* 441 U.S. at 373, 99 S.Ct. at 1757 (footnote omitted) also added:

---

**19.** See, e.g., *Fencl v. Abrahamson,* 841 F.2d 760, 769 (7th Cir.1988).

As was unequivocally said in *Miranda,* mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

Enough as to general background. It is time to turn to the facts of Scarpelli's situation.

First Scarpelli contends he invoked his right to counsel on three occasions before the July 16 interrogation.[20] That argument fails for two reasons.

■ First, *Miranda* applies only to *custodial* interrogation (384 U.S. at 467–68, 86 S.Ct. at 1624–25). There is not a shred of evidence that Scarpelli was "in custody" on any of the three occasions he identifies. Only the March 4 stop might potentially qualify, and there the agents specifically told Scarpelli he was *not* under arrest—they were there only to serve the grand jury subpoena and solicit Scarpelli's cooperation. More importantly, he was *in fact* not under restraint: He was free to leave at any time. In summary, before July 16 Scarpelli was never subjected to custodial interrogation so as to trigger *Miranda* rights.[21]

■ Second, it is truly absurd to contend that a subject of possible criminal investigation (at most a suspect, not a defendant) can say he wants to be represented by counsel and thereby claim a prohibition in perpetuity against his even being *asked* at some future date whether he is willing to respond to questioning by law enforcement officers (a future date when, it must be emphasized, he is specifically informed of his right to counsel and specifically refuses to exercise it).[22] Yet that is Scarpelli's position: He says when he invoked his right to counsel[23] on March 14, he had a constitutional right to have counsel present for any future government contact (including the July 16 interrogation). As his Mem. 17 puts it:

> The mere passage of time between March 14, 1988 and July 16, 1988 does not serve to vitiate Scarpelli's unequivocal invocation of the right to have counsel present for contacts between the government and himself.

Scarpelli has not cited, nor has this Court found, a single case to support that conclusion—or to refute the opposite conclusion, which is compelled by the force of logic. Though he refers to *Edwards* and *Roberson,* neither case even begins to provide him with any comfort. Scarpelli cannot bootstrap any of the pre-July 16 contacts into an effective permanent invocation of a constitutional right to counsel that somehow limits his ability to have waived that right when he was taken into custody July 16 (four months after the then most recent contact with the agents). It is time to look at that latter question on its own.

---

20. Scarpelli Mem. 14–16 identifies those times as:

    1. January 22, 1988, when FBI Special Agent Robert Pecoraro came to his home;

    2. March 4, 1988, when O'Rourke served Scarpelli with the grand jury subpoena; and

    3. March 14, 1988, when Scarpelli appeared with Steinback at FBI offices in compliance with the subpoena.

21. That of course moots Scarpelli's assertion that he actually invoked his right to an attorney during those prior occasions. Accordingly there is no need to pursue the questionable nature of Scarpelli's claim that he even asserted that right on March 4—the principal instance on which he relies.

22. Though the analogy is of course imperfect, the law permits a contract provision, which limits future amendments to those in writing, itself to be amended orally—thus opening up the prospect of oral amendments to the contract's substantive provisions. Human beings are privileged to change their minds—and nothing in the law supports the kind of irrevocable communication Scarpelli now asserts.

23. As already indicated, the convenient shorthand reference here to "right to counsel" should not be mistaken for the constitutional right created by the Sixth Amendment.

Scarpelli Mem. 18 says he invoked his right to counsel during the July 16–17 interrogation. Not so. At that time Scarpelli specifically and unequivocally waived all of his *Miranda* rights, including his right to counsel. Responsive to the mandate in *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141, this Court now expressly finds:

1. For the same reasons outlined earlier in this opinion, Scarpelli relinquished his right to counsel voluntarily. It was the "product of a free and deliberate choice" and not the result of any "intimidation, coercion, or deception."

2. Scarpelli waived his right "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

Once again the totality of the circumstances plainly shows Scarpelli understood his rights (he acknowledged that) and voluntarily decided to waive them. His signature on Form FD–395 (Govt.Ex. 89) confirms such an express intention. As *United States v. Springer*, 460 F.2d 1344, 1349 (7th Cir.1972) (citations omitted) puts it:

Other courts have reached the same conclusion that the reading of the form to the accused and giving him a chance to read it himself, followed by his statement that he understands his rights and his signature on the form, is sufficient to satisfy the *Miranda* test.

This Court reaches the identical conclusion. Much of what has been said in the previous section dealing with the voluntariness of the confession is equally applicable here. It need only be added that Scarpelli was unquestionably also fully aware of the nature of his rights.

In sum, none of Scarpelli's right-to-counsel claims has any merit. It is again time to move on.

---

**24.** It will be assumed for present purposes (1) that the Steinback representation was confirmed to Burley by Steinback's March 4 statement to that effect and (2) the March 4 and July 16 matters were sufficiently similar in nature to create the inference that they might constitute the same "matter" for purposes of DR 7–104(A)(1). That second assumption, one most favorable to consideration of Scarpelli's argument, is not free from doubt and is therefore made arguendo.

## DR 7–104(A)(1)

DR 7–104(A)(1) provides:

A. During the course of his representation of a client a lawyer shall not:

1. Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Federal courts enforce professional responsibility standards as an exercise of their inherent supervisory power and "the standards imposed are a matter of federal law" (*In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881 n. 6, 86 L.Ed.2d 504 (1985)).

Scarpelli Mem. 19–20 argues that Steinback represented him, that Burley and the agents were expressly notified of that fact and therefore that "DR 7–104(A)(1) was violated when the agents conducted the July 16 interrogation without Steinback." [24] Scarpelli correctly observes that federal courts enforce standards of professional responsibility pursuant to their supervisory power. As the final step in the chain he argues that suppression is the appropriate remedy for the asserted violation in this case.

That presents a truly interesting question. Scarpelli seeks to rely on *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), which reflects the most comprehensive treatment of the subject (though the complained-of conduct there was traceable to the United States Attorney rather than being that of law enforcement officers alone, so that DR 7–104(A)(1) was *directly* implicated [25]). *Hammad* held:

---

**25.** By contrast, where as here FBI agents are the ones alleged to have ignored the existence of a lawyer-client relationship, with no suggestion that their interrogation was directed by or even known in advance to the government lawyer, the asserted victim has to rely on the philosophical underpinning of the DR rather than on any literally rule-violative conduct.

1. DR 7–104(A)(1) is applicable to criminal cases and covers the conduct of government attorneys and of non-attorney law enforcement officers when they act as the alter egos of government attorneys.

2. DR 7–104(A)(1) reaches beyond the Sixth Amendment to cover the investigatory stages of a criminal prosecution.

3. Suppression of evidence obtained in violation of the DR may be ordered as a remedy at the district court's discretion.

4. Because the law was unsettled when the prosecutor had acted, the district court's suppression order was an abuse of discretion.

Because our Court of Appeals has not dealt in terms with the issue, it is worth a brief look at federal authorities elsewhere before turning to arguably related Seventh Circuit authority. Dicta in *United States v. Killian*, 639 F.2d 206, 210 (5th Cir.1981) and *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.1973) share the view expressed at greater length in *Hammad* that suppression may be the appropriate judicial response at least to *lawyers'* violations of DR 7–104(A)(1).[26] On the other hand, *United States v. Sutton*, 801 F.2d 1346, 1366 (D.C.Cir.1986) has specifically rejected a defendant's objection based on the DR where the challenge was addressed to conversations tape recorded by law enforcement officers with no government lawyer's involvement:

Rule 7–104 was never meant to apply to situations such as this one, but was meant to ensure that lawyers not prey on persons known to be represented by counsel.

*United States v. Dobbs*, 711 F.2d 84, 86 (8th Cir.1983) is to the same effect.

As for the law in this Circuit, our Court of Appeals has recently expressed some skepticism as to the use of the courts' "supervisory power" to promulgate prophylactic rules in the criminal law area— see, e.g., *United States v. Schwartz*, 787 F.2d 257, 267 (7th Cir.1986) and *United States v. Widgery*, 778 F.2d 325, 328–28 (7th Cir.1985); but contrast *United States v. Johnston*, 690 F.2d 638 (7th Cir.1982), where both the en banc majority and the dissent were substantially more hospitable to the supervisory-power concept (in that case as to the advocate-witness rule codified in DR 5–101(B) and DR 5–102). Somewhat closer to the issue Scarpelli seeks to portray here, in an earlier stage of development under DR 7–104(A)(1) the majority in *United States v. Durham*, 475 F.2d 208 (7th Cir.1973) rejected Judge Swygert's dissenting-view proposal of a per se rule that would exclude confessions obtained in the absence of retained counsel known by the agents to be representing the defendant on the criminal charge involved. During the preceding year *Springer*, 460 F.2d at 1353– 54 had suggested that a government lawyer's violation of the DR might bar the introduction of statements obtained through that violation as an exercise of the court's supervisory power.[27]

This Court would therefore not be wholly without guidance (either here or elsewhere) if this case really posed the problem Scarpelli's counsel seek to portray. But two

---

**26.** Justice White's dissenting opinion in *Massiah v. United States*, 377 U.S. 201, 210–11, 84 S.Ct. 1199, 1205–06, 12 L.Ed.2d 246 (1964) emphasized the then existing Canon of Ethics (now embodied in the DR) "deals with the conduct of lawyers and not with the conduct of investigators." However, the *Thomas* court later took a far more expansive stance. Though the law enforcement officer there obtained the defendant's statement without the knowledge of the government's lawyer, and though it was questionable whether the agent even knew the defendant had been represented by counsel, the court held the government lawyer's later *use* of the statement in the criminal case would violate the DR! Because (1) the defendant there was already in custody on a criminal complaint, (2) the attorney had been appointed to represent him at the preliminary hearing and (3) the statement was taken in prison, the facts in *Thomas* were materially stronger for potential application of the DR than those in this case. It is unclear whether the Tenth Circuit would extend its bright-line rule to the much more attenuated situation (in several respects) hypothesized here.

**27.** Although the majority rejected that result in the case before them, then Judge (now Justice) Stevens dissented, labeling the conduct as a violation of due process.

factors make it unnecessary to reach that question.

 First, as n. 25 indicates, there is nothing to tie Burley to the Noble–O'Rourke interrogation of Scarpelli. Like all of the Code of Professional Responsibility, DR 7–104(A)(1) speaks of *lawyer* conduct. *Hammad* extended that coverage to nonlawyers doing a lawyer's bidding, but neither that case nor *Killian* would support a further stretching of judicial supervisory authority concepts to reach Scarpelli's claimed scenario (though *Thomas* might do so).

More importantly, if anything is plain in this area, it is that the law is *not* plain in its application to the situation that has been assumed arguendo as having confronted the agents dealing with Scarpelli. Lacking clear Seventh Circuit authority (or even a clear trend in the law elsewhere), it would be wrong for any district court to expand the boundaries of supervisory authority to penalize such governmental conduct—not known to be improper when it took place—by suppressing Scarpelli's statements. *Hammad,* Scarpelli's own authority, held such a district court action reversible error—an abuse of discretion. This Court will not flout that teaching.[28]

## CONCLUSION

This Court has reviewed the evidence and analyzed all of Scarpelli's arguments. None of them has merit. Taken all in all, the totality of the circumstances unquestionably demonstrates his confession was volitional and intelligently made. Scarpelli's motion to suppress is denied.

One related issue remains. Until now the documents relating to this issue have been maintained under seal, over the objection of the United States.[29] At this point the dynamics of the situation have changed, and the parties should be prepared at the next status hearing (set for May 4, 1989) to discuss the appropriate disposition of that aspect of the case.

---

**28.** *Miranda* and the Fourth–Amendment-derived exclusionary rule are the best-known examples of the dramatic effect a rule of law may have on the future conduct of law enforcement officers. Where (as in both those instances) the rule of law is constitutionally mandated, its pronouncement must also grant relief to the individual who has been harmed by its violation and who first raises it successfully in the courts—even though the previously-unannounced rule was by definition unknown to the officers when they engaged in the rule-violative conduct. Parenthetically, future courts must then confront the familiar problem of whether and to what extent the rule is to be given retroactive application. But to return to the subject at hand, where a rule affecting future conduct appears desirable as a matter of judicial administration even though not constitutionally mandated—as in the exercise-of-supervisory-powers phenomenon—its conduct-affecting goal need not be accomplished at the cost of thwarting law enforcement efforts (which were by definition legal when undertaken) in the specific case in which the conduct is first declared improper. There is nothing to prevent such a declaration from being totally prospective. And of course such a declaration must come from a court whose decisions bind other courts—the Supreme Court or a Court of Appeals—and not a District Court.

**29.** During the pendency of the motion to suppress, any public revelation of the fact and nature of Scarpelli's disclosures to the FBI agents would have created the potential for retaliatory conduct of the kind Scarpelli told the agents he feared when he wanted to keep his arrest secret. That was such an obvious consideration that this Court considered it outweighed the strong public policy favoring public court proceedings so long as the potential for suppression remained (see n. 2).